Frank STEVENSON and Rebecca Harshberger, Administratrix of the Estate of Mary E. Stevenson, Deceased, Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY, Defendant.

No. 2:99–CV–00160 WRW.

United States District Court,
E.D. Arkansas,
Helena Division.

Aug. 29, 2000.

B. Michael Easley, Easley, Hicky, Cline & Hudson, Forrest City, AR, Robert L. Pottroff, Meyers, Pottroff and Ball, Manhattan, KS, Stephen W. Boyda, Marysville, KS, for Frank Stevenson, Rebecca Harshberger.

Scott H. Tucker and Joseph Patrick McKay, Friday, Eldredge & Clark, Little Rock, AR, for Union Pacific Railroad Company.

## *ORDER GRANTING PARTIAL SUMMARY JUDGMENT*

WILSON, District Judge.

Pending is Defendant's Motion for Partial Summary Judgment (Doc. No. 10), Plaintiffs' Response (Doc. No. 26), and Defendant's Reply (Doc. No. 29). A hearing was held on July 24, 2000. For the reasons set forth below, Defendant's Motion for Partial Summary Judgment is GRANTED.

## BACKGROUND

This case arises out of a November 6, 1998 grade crossing collision at the Highway No. 364 crossing in Vanndale, Cross County, Arkansas. Plaintiff Frank Stevenson was driving the car that was hit, and his wife, Mary E. Stevenson, a passenger in the right front seat, was killed.[1] The train was owned and operated by Defendant Union Pacific Railroad Company.

Plaintiffs allege that Defendant was negligent in: (1) failing to provide effective warning systems on the train; (2) operating its train too fast for conditions; and (3) failing to provide adequate fixed warning signals at the crossing.

Defendant filed a motion for partial summary judgment, arguing that Plaintiffs' claims are preempted by federal law—the Locomotive Inspection Act, 49 U.S.C. § 20701, et. seq.; the Federal Rail Safety Act of 1970, 49 U.S.C. § 20106; the Highway Safety Act of 1973, 23 U.S.C. § 130 et seq. as amended; and the regulations issued by the Secretary of Transportation.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial on disputed factual issues. *Inland Oil & Transp. Co. v. United States,* 600 F.2d 725 (8th Cir.1979), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K.–Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.,* '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry

---

**1.** Plaintiff Rebecca Harshberger is the administratrix of Ms. Stevenson's estate.

that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273–274 (8th Cir.1988) (citations omitted) (brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## WARNING SYSTEMS

First, Defendant argues that Plaintiffs' claim that Union Pacific failed to provide an effective warning system on the train is preempted by the Locomotive Inspection Act, 49 U.S.C. § 20701, et. seq. The "warning system" at issue is the train's horn.

Plaintiffs stipulate that they will not claim the device was inadequate, i.e., they will not claim that it could not have been blown in the proper manner. *See* Brief in Support of Response to Motion for Summary Judgment (Doc. No. 27), p. 11. So, Defendant's Motion for Summary Judgment on this point is GRANTED.

## TRAIN SPEED

Defendant also argues that Plaintiffs' claim that Union Pacific operated its train too fast for conditions is preempted by the Federal Rail Safety Act of 1970, 49 U.S.C. § 20106, and 49 C.F.R. § 213.9(a).

Plaintiffs agree that federal law governs the track speed limits. This is a Class IV track, with a 60 m.p.h. speed limit for freight trains and 80 m.p.h. for passenger trains. The train involved in the accident was going 49 m.p.h. Plaintiffs do not claim a lower speed limit would be appropriate for a Class IV train. However, they argue that four items related to speed are not preempted.

**1. Claims for Failure to Slow for a Specific, Individual Hazard.**

In 49 U.S.C. § 20106, Congress limited a State's right to regulate train speeds.

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an *essentially local safety hazard;*
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (emphasis added).[2] The federal speed limits for trains are set out in 49 C.F.R. § 213.9.

The United States Supreme Court has held that the maximum allowable speeds codified at 49 C.F.R. § 213.9(a), "cover[ ] the subject matter of train speed with respect to track conditions, including conditions posed by grade crossings," and therefore, preempt common law tort claims asserting that a train traveled at an excessive rate of speed. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

However, the *Easterwood* Court reserved ruling on whether the preemption of excessive speed claims extends to "bar suit[s] for breach of related tort duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Id.* at 675 n. 15, 113 S.Ct. 1732. A "specific, indi-

---

**2.** Through this statute, Congress created a narrow exception where a State may impose a lower speed limit · than that provided by federal law. Plaintiffs have not argued that

Arkansas has adopted a law or regulation with regard to the speed limit at the crossing in Vanndale, Arkansas, or that this exception applies to their situation.

vidual hazard" is not to be confused with the statutory "essentially local safety hazard" set forth in 49 U.S.C. § 20106.

Subsequent courts, faced with this preemption issue, have recognized an exception to federal preemption where a "specific, individual hazard" exists. *See, e.g., Bashir v. National Railroad Passenger Corp.*, 929 F.Supp. 404, 412 (S.D.Fla.1996) (holding there was no preemption where a child was standing on the track); *Shaup v. Frederickson*, 1998 WL 726650 (E.D.Pa. 1998) (holding there was no preemption where train failed to slow after seeing plaintiff's car stranded on the tracks); *Florida East Coast Railway Co. v. Griffin*, 566 So.2d 1321 (Fla.App.1990) (holding there was no preemption where 13–year–old child was hit by train while attempting to cross tracks on way home from school); *Bakhuyzen v. National Rail Passenger Corp.*, 20 F.Supp.2d 1113, 1118 (W.D.Mich. 1996) (holding conductor had duty to slow train due to snowstorm).

 Plaintiffs claim the following factors cause this crossing to fall within the "specific, individual hazard" exception.

 a) The crossing in question is one of seven in less than 1.5 miles of track in or near the community of Vanndale.

 b) Each of the crossings in the corridor has limited sight distances.

 c) The crossings are in violation of A.C.A. § 23–12–201 concerning vegetation along the track at a public road.

 d) Each crossing suffers from poor maintenance.

 e) The signs at the crossings do not comply with the MUTCD.[3]

 f) There is a serious history of whistle violations in the corridor down which the tracks run.

 g) There is a history of near misses at the crossings in question.

 h) There is a terrible history of accidents at the crossings in Vanndale.

 i) The three crossings in Vanndale have a heavy daily traffic count.

 j) The three crossings in Vanndale have had 10 accidents since 1983.

 k) None of the crossings are protected by anything more than crossbucks.

 l) A state highway goes over the crossing.

 m) The crossing where the accident occurred has had at least six accidents and two fatalities.

 n) The crossing where the accident occurred is now scheduled to get gates under the federal funding program, according to an informal conversation between counsel and the state traffic engineer, Mike Selig.

*See* Plaintiff's Brief in Support of Response to Motion for Summary Judgment, pp. 15–16 (Doc. No. 27).

An examination of some of the cases interpreting the specific, individual hazard exception may be helpful. One court stated:

> Generally, courts considering this issue have ruled that a "specific individual hazard" must be a discrete and truly local hazard, such as a child standing on the railway. They must be aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA.... More precisely phrased, the "local hazard" cannot be statewide in character and cannot be capable of being adequately encompassed within uniform, national standards.... An alternative, expansive construction of the local safety hazard language would excessively preserve local speed regulations and significantly undermine the Secretary's ability to prescribe uniform operational speeds.

*O'Bannon v. Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1420–21 (W.D.Mo.1997) (citing *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1553 n. 3 (11th Cir.1991) (citing H. Rep. No. 1194, 91st Cong., 2d Sess. 11 (1970), reprinted in 1970 U.S.C.C.A.N.

---

**3.** Manual on Uniform Traffic Control Devices.

4104, 4117), aff'd, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).

The plaintiffs in *O'Bannon* complained of the lack of active warning devices at the crossing, the steep grade and angle of the crossing, and the proximity of the crossing to a highway. The court held these conditions did not create a specific, individual hazard, stating:

> Plaintiffs' allegation is not the type of individualized hazard to which the *Easterwood* Court and § 20106 refers. Warning devices, grade, angle, and proximity to highways are all general conditions of crossings that are amenable to uniform, national standards. Furthermore, defects related to these conditions are already accounted for in the Secretary's regulations governing maximum operational speeds. Thus, stripped of its cloak, Plaintiffs' argument is revealed to be one premised on excessive speed— they essentially argue that trains should always reduce their speed when approaching dangerously designed crossings like the one at Sellers Road. The *Easterwood* court found excessive speed claims preempted. Consequently, the Court finds that summary judgment is appropriate on this claim.

*Id.* at 1421.

In *Steva v. Soo Line R.R. Co.*, the Eighth Circuit held that high traffic volume, lack of an active warning device, grade and angle of the crossing, and surrounding vegetation did not constitute a specific, individual hazard. *See Steva v. Soo Line R.R. Co.*, 117 F.3d 1423 (8th Cir.1997) (*unpublished disposition, see* 1997 WL 381854). "These conditions can commonly be found at other crossings, however, and can be adequately addressed within uniform common national standards." *Id.*

In *Herriman v. Conrail Inc.*, 883 F.Supp. 303 (N.D.Ind.1995), an Indiana District Court held that artificial lights mounted on a nearby building did not constitute a specific, individual hazard because the allegedly hazardous lights were continuously present at the crossing, and the duty the plaintiffs sought to impose was not one that would have required that particular engineer to slow down, but in fact would require a substantial reduction in speed by every train entering that crossing at night.

> This ... is distinguishable from the obvious case of an individual hazard—i.e. an engineer who sees a motorist stranded on the crossing, but nevertheless negligently fails to stop or slow his train to avoid the collision.... The condition of disruptive lighting can, and does, exist at numerous crossings throughout the state, and therefore is not unique to this locality.

*Id.* at 307.

Courts have found specific, individual hazards existed where a train crew saw or should have seen a child or a car on the track. *See, e.g., Bashir v. National R.R. Passenger Corp.*, 929 F.Supp. 404, 412 (S.D.Fla.1996) (child standing on the track); *Shaup v. Frederickson*, 1998 WL 726650 (E.D.Pa.1998) (plaintiff's car stranded on the tracks); *Central Georgia R.R. Co. v. Markert*, 200 Ga.App. 851, 410 S.E.2d 437 (1991) (imminent collision with car crossing the track); *Florida East Coast Ry. Co. v. Griffin*, 566 So.2d 1321 (Fla.App.1990) (13-year-old child hit by train while attempting to cross tracks on way home from school).

But, many of these courts have observed that the specific, individual hazard exception is a narrow one. *See, e.g., Bashir*, 929 F.Supp. at 412 ("Plaintiff cannot maintain a claim of failure to proceed slowly along the tracks in order to avoid the likelihood of hazards such as the Decedent since .... a claim of failure to maintain a slow speed to avoid potential hazards is simply another way of claiming that the train was traveling at an excessive speed given the track type, location, and conditions, which *Easterwood* precludes as preempted.").

The *Bakhuyzen* court considered whether the conductor had a duty to slow the

train down due to a snowstorm. Holding that he did, the court noted that weather conditions are not capable of being adequately encompassed within uniform national standards. *See Bakhuyzen v. National R.R. Passenger Corp.*, 20 F.Supp.2d 1113, 1118 (W.D.Mich.1996).

Plaintiffs cite *In re Speed Limit for Union Pacific Through City of Shakopee*, 610 N.W.2d 677 (Minn.Ct.App.2000), in support of their contention that the crossing in Vanndale constitutes a specific, individual hazard. However, *Shakopee* does not deal with the "specific, individual hazard" exception; rather, it deals with the "essentially local safety hazard" exception set forth in 49 U.S.C. § 20106, *supra.*

In *Shakopee*, the Commissioner of the Minnesota Department of Transportation imposed a 10 m.p.h. speed limit along a one mile segment of track in the city's downtown business district. Union Pacific challenged his decision and lost. On appeal, the Minnesota Court of Appeals stated:

> Here, the commissioner determined that the track segment in downtown Shakopee qualifies as an essentially local safety hazard because (1) it runs down the middle of a city street with parallel lanes of traffic on both sides; (2) it has ten grade crossings within one mile; (3) it has a high volume of pedestrian and vehicular traffic; (4) the trains run in close proximity to traffic and buildings; and (5) the segment of track is the only place in Minnesota exhibiting this unique combination of factors. Union Pacific argues that under *O'Bannon*, the numerous crossings and volume of pedestrians and traffic in downtown Shakopee cannot create an essentially local safety hazard because these factors are not unique. We disagree. It is these multiple, common, hazardous factors coupled with the truly distinguishing characteristic of a track that runs between opposing lanes of traffic down the middle of a downtown street that renders the one-mile segment of track in

Shakopee an essentially local safety hazard.

*Id.* at 685.

Perhaps the crossing in Vanndale does constitute an "essentially local safety hazard" such that the State of Arkansas could adopt a law or regulation more stringent than the federal regulations. However, the State of Arkansas has not adopted any such law or regulation.

According to the numerous cases on this point, the conditions complained of by Plaintiffs are capable of being adequately encompassed within uniform national standards and are accounted for in the Secretary's regulations governing maximum operational speeds. They do not constitute specific, individual hazards. Plaintiffs' claim of failure to maintain a slow speed to avoid the potential hazards at this crossing is simply another way of claiming the train was traveling at an excessive speed, given the track type, location, and conditions. This is preempted.

**2. Negligent Failure to Issue a Slow Order**

■ The railroad has a duty to issue a slow order under some circumstances. For example, federal regulations provide that if a false activation of warning signals at a crossing has occurred, passing trains must slow to 15 m.p.h. unless someone is stationed at the crossing. *See* 49 C.F.R. § 234.107.

■ Plaintiffs argue that a "slow order" should have been issued based on "a number of track conditions found in the area including the specific local hazard." As authority for this argument, Plaintiffs point to two cases. *See Stone v. CSX Transp., Inc.*, 37 F.Supp.2d 789 (S.D.W.V. 1999) (false activation of gates combined with failures to maintain and inspect at a crossing with short sight lines on the only road out of an area); *Florida East Coast Ry. Co. v. Griffin*, 566 So.2d 1321 (Fla. App.1990) (13–year–old child hit by train while attempting to cross tracks on the

way home from school; no preemption where engineer and brakeman saw the traffic conditions and knew or should have known of the hazard—that school children crossed the tracks frequently—and failed to reduce speed).

Both *Stone* and *Griffin*, however, found that a specific, individual hazard existed. Plaintiffs have not shown a specific, individual hazard existed in Vanndale.

■ Plaintiffs argue 49 C.F.R. § 213.9 requires that track segments which do not meet the requirements of a particular class be downgraded to the next lowest class until the requirements are met. Plaintiffs' expert, Alan Blackwell, a track inspector, opined that trains in Vanndale should be ordered to operate at restricted speed until all crossing defects are corrected, and a slow order should have been issued before the accident. Thus, Plaintiffs argue the tracks should have been downgraded from Class IV to Class III, which would require a reduction in speed from 60 m.p.h. to 40 m.p.h.

Federal law provides, however, that the decision to downgrade a track belongs to the FRA track inspector.

> When a FRA track inspector ... determines the track does not comply with the requirements of the class at which the track is being operated, ... he notifies the railroad in writing that the track is being lowered in class ....

49 C.F.R. § 216.15(a). The FRA inspector in this case inspected the tracks regularly before the accident and found that they complied with the Class IV requirements.

The Seventh Circuit rejected a similar argument in *Shots v. CSX Transp., Inc.*, 38 F.3d 304 (7th Cir.1994). "The preemptive effect of a safety requirement laid down by the Secretary cannot be challenged in a tort suit by arguing to the Court that he made a mistake—that he should have im-

posed a more stringent requirement.... To allow this sort of collateral challenge would put the railroad in an impossible position." *Id.* at 308.

Plaintiffs are attempting to reclassify the track after the fact. This is an impermissible collateral attack on the regulatory process.

**3. Restricted Locomotive Speed Mandated by 49 C.F.R.**

■ Plaintiffs argue that, under federal regulations, Defendant's train should not have been going faster than 30 m.p.h.[4] This regulation provides: "Any train operated faster than 30 m.p.h. shall have an in-service recorder in the lead locomotive." 49 C.F.R. § 229.135.

Plaintiffs argue Defendant's event recorder was not "in service," and Defendant should have slowed the train to 30 m.p.h. Defendant argues that the recorder was "in service," but even if it was not, the regulation codified at 49 C.F.R. § 229.135 does not regulate the speed of train, but instead simply designates which trains must carry an event recorder.

The event recorder on the lead locomotive recorded everything except the horn. Although designed to do so, it did not record the horn being blown a single time on the entire trip. Plaintiffs argue, therefore, that the data event recorder was not "in service."

> "In-service event recorder" means an event recorder that was successfully tested as prescribed in § 229.25(e) and whose subsequent failure to operate as intended, if any, is not actually known by the railroad operating the locomotive on which it is installed.

49 C.F.R. § 229.5(i). It appears Defendant may have had prior knowledge of this malfunction.[5]

---

**4.** Plaintiffs' argument is not that this issue is not preempted by federal law, but, rather, that federal law required Defendant to slow the train.

**5.** Plaintiff has provided the affidavit of J.C. Scott, a railroad consultant, who states the railroad was on notice of the alleged defect. Mr. Scott avers that a copy of the F.R.A.

The definition of "event recorder" includes a listing of what the event recorder is required to monitor and record. The horn is not listed.

> Event recorder means a device, designed to resist tampering, that monitors and records data on train speed, direction of motion, time, distance, throttle position, brake applications and operations (including train brake, independent brake, and, if so equipped, dynamic brake applications and operations) and, where the locomotive is so equipped, cab signal aspect(s), over the most recent 48 hours of operation of the electrical system of the locomotive on which it is installed.

49 C.F.R. § 229.5(g).

Plaintiffs argue that recording of the horn is required by 49 C.F.R. § 229.25(e).

> The event recorder, if installed, shall be inspected, maintained, and tested in accordance with the instructions of the manufacturer, supplier, or owner thereof and in accordance with the following criteria . . . .

49 C.F.R. § 229.25(e). The event recorder in question was designed to record the horn; therefore, Plaintiffs argue it had to record the horn to be "in service."

Neither Plaintiffs nor Defendant cited cases on this issue, and I have been unable to locate any. So, to resolve this issue, I am left with the regulations which support the conclusion that the event recorder does not have to record the horn. The Secretary, through regulations, has stated what the device must record. Then, the Secretary provided that, when testing the recorder, it should be tested in accordance with the instructions of the manufacturer. There is nothing in the regulations to suggest that this testing requirement was intended to increase the number of items that the device is required to record.

However, even if recording of the horn is required, I cannot come to the next conclusion desired by Plaintiffs—that the train, therefore, had to slow to 30 m.p.h.

A further reading of 49 C.F.R. § 229.25(e) tells what is to happen if the event recorder does not test in accordance with the manufacturer's instructions.

> If this test does not reveal that the device is recording all the specified data and that all recordings are within the designed recording parameters, *this fact shall be noted on the data verification result* required to be maintained by this section *and maintenance and testing shall be performed as necessary until a subsequent test is successful.*

49 C.F.R. § 229.25(e)(3) (emphasis added). It does not say the train must slow down. Further, the regulation recognizes that occasional failures are expected—periodic maintenance is considered *effective* as long as 90% of the recorders are fully functional. *See* 49 C.F.R. § 229.25(e)(5).

49 C.F.R. § 229.135, which requires an in-service recorder be placed in the lead locomotive, also provides:

> A railroad may remove an event recorder from service and, *if a railroad knows that an event recorder is not monitoring or recording the data specified in § 229.5(g), shall remove the event recorder* from service.

49 C.F.R. § 229.135(c) (emphasis added). This regulation also prescribes the response to be made when there is defective equipment—where the event recorder has been taken out of service, the locomotive can continue to operate as the lead locomotive until the next inspection, and is not deemed out of compliance. *See* 49 C.F.R. § 229.135(b).

I conclude that failure to record the horn does not render the event recorder out of service. But, even if it did, a train

---

required locomotive maintenance and inspection records which clearly show a malfunctioning event recorder, are attached to his affidavit. *See* Affidavit, paragraph 24, Exhibit

7 to Plaintiffs' Response to Motion for Summary Judgment. There are no such attachments.

is not required to slow to 30 m.p.h. just because it carries a defective event recorder.

### 4. Relevancy of Train Speed for Other Purposes

Plaintiffs argue the train speed will be relevant for other purposes. Defendant does not dispute this assertion at this time. These issues are reserved.

## ADEQUACY OF THE WARNING DEVICES AT THE CROSSING

■ Finally, Defendant argues that Plaintiffs' claim that the grade crossing is abnormally dangerous and should have been equipped with special warnings, is preempted by: the Federal Rail Safety Act of 1970, 49 U.S.C. § 20106; the Highway Safety Act of 1973, 23 U.S.C. § 130 et. seq. as amended; and the regulations issued by the Secretary of Transportation.

The Federal Rail Safety Act (FRSA) was passed in 1970 with the stated purpose of promoting safety in all areas of railroad operations. *See* 49 U.S.C. § 20106. It specifically directed the Secretary of Transportation to prescribe regulations for all areas of railroad safety, and provided that States could adopt or continue to enforce any law or rule of its own only *until* the Secretary adopted a rule covering the subject matter.

In 1973, Congress passed the Highway Safety Act that made federal funds available to states to improve grade crossings. The states are to "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d).

Additional regulations were issued by the Secretary of Transportation through the Federal Highway Administration ("FHWA"). Under these regulations, each State receiving federal aid is required to establish a "highway safety improvement program" that, among other things, establishes priorities based on the ranking of the State's crossings by the dangers posed at those crossings. *See* 23 C.F.R. § 924.9(a)(4).

Other regulations require States to use warning devices that conform to standards set out in the FHWA's Manual for Uniform Traffic Control Devices ("MUTCD"). *See* 23 C.F.R. § 646.214(b)(1). Additional regulations specify the particular type of warning devices that must be installed when federal funds are used. *See* 23 C.F.R. § 646.214(b)(3) and (4).

Although Congress delegated authority to the Secretary to establish regulations regarding all areas of railroad safety and to allocate federal funds to States to improve safety at crossings. Congress limited the Secretary's authority as follows: "[n]o [federal] funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing ...." 23 U.S.C. § 109(e).

Under these regulations, the federal government, the state government, and the Missouri Pacific Railroad (now Union Pacific) embarked on a statewide project for upgrading crossbucks at Missouri Pacific crossings. Plans were drawn up by the Arkansas Highway and Transportation Department (AHTD) and submitted to the Federal Highway Administration (FHWA). Then, an Agreement of Understanding was executed between Missouri Pacific (now Union Pacific) and the State of Arkansas in 1980. The Agreement's purpose was "to implement a project to upgrade the signing at railroad crossings to conform to the Manual on Uniform Traffic Control Devices (MUTCD)." Further, it was the railroad's responsibility to "Maintain all signs installed by this project with replacements to be of comparable quality of mate-

rial and workmanship as the original program installation."

FHWA approved the planned specifications and estimates in 1980. The job was completed, and on February 25, 1981, AHTD completed its final inspection and determined all work had been completed in compliance with the contract specifications. On March 6, 1981, FHWA completed its form titled "Final Inspection and Acceptance of Federal Aid Project Constructed Under Secondary Road Plan" and indicated the job had been completed in conformity with the procedures and standards contained in the state's secondary road plan agreement. On March 22, 1988, the final voucher for payment was paid by FHWA to Arkansas. FHWA paid 90% of the costs of the project.

Defendant argues this is the factual predicate necessary for federal preemption of Plaintiffs' common law negligence claims. Plaintiffs make several arguments in response.

**1. Failure to Comply with MUTCD and No Finding by AHTD that the Crossbucks Were Adequate Protection.**

Plaintiffs argue that preemption cannot exist because of a failure to comply with the requirements of MUTCD and the absence of a finding by AHTD that the crossbucks were adequate protection for this crossing.

Plaintiffs assert Defendant breached its 1980 Agreement with the State in several respects, and, because Defendant did not meet its contractual and legal obligation under the Agreement, Defendant forfeited its claim to preemption. Plaintiffs' argument essentially appears to be two-fold:

1) The installation did not comply with federal standards at the time of installation and, thus, preemption does not apply; and

2) The signs were improperly maintained, in violation of Union Pacific's

agreement, and thus, preemption does not apply.

**a. Compliance with Federal Standards at the Time of Installation**

An "adequate warning device" is defined at 23 C.F.R. § 646.214(b), which states:

(3) (i) "Adequate warning devices", under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency,

State highway agency, and/or the railroad, is subject to the approval of FHWA.

23 C.F.R. § 646.214(b).

The United States Supreme Court stated that:

> [O]nce the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation "displace[s] state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained."

*Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 1472, 146 L.Ed.2d 374 (2000) (citing *Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732).

Plaintiffs argue that the crossbucks in Vanndale, Arkansas were not operating at the time of the installation, and, therefore, preemption cannot apply.

The flaw in Plaintiffs' argument is that FHWA had determined the crossbucks were operating. The State drafted specifications and estimates for the installation of warning devices at various crossings and provided those to FHWA. FHWA approved the planned specifications and estimates, and after work was completed, AHTD completed its final inspection and determined all work had been completed in compliance with the contract specifications. Then, on March 6, 1981, FHWA completed its form titled "Final Inspection and Acceptance of Federal Aid Project Constructed Under Secondary Road Plan" and indicated the job had been completed in conformity with the procedures and standards contained in the state's secondary road plan agreement. *See* Affidavit of Mike Selig, Exh. 3 to Defendant's Brief in Support of Motion for Summary Judgment (Doc. No. 11). Thus, FHWA determined the crossbucks were operating. Plaintiffs' attempt to dispute this determination now is another impermissible collateral attack on the regulatory process.

Plaintiffs also argue that preemption cannot exist absent a finding by AHTD that the crossbucks were adequate protection for this crossing. Plaintiffs argue that the 1980 Agreement to fund installation of crossbucks never claimed to address (b)(3) conditions, and the evidence is overwhelming that the crossing had multiple (b)(3) conditions that mandated flashing lights and gates. Plaintiffs argue AHTD either had to review the (b)(3) conditions at the crossing or determine that warning devices other than gates were appropriate.

In *Shanklin,* 120 S.Ct. at 1467, the plaintiff's husband was killed in a crossing accident, and the plaintiff brought a suit claiming that the warning signs posted at the crossing, which had been installed using federal funds, were insufficient to warn motorists of the danger posed by passing trains. The Supreme Court held:

> Sections 646.214(b)(3) and (4) 'cover the subject matter' of the adequacy of warning devices installed with the participation of federal funds. As a result, the FRSA preempts respondent's state tort claim that the advance warning signs and reflectorized crossbucks installed at the Oakwood Church Road crossing were inadequate. Because the TDOT [Tennessee Dept. of Transportation] used federal funds for the signs' installation, §§ 646.214(b)(3) and (4) governed the selection and installation of the devices. And because the TDOT determined that warning devices other than automatic gates and flashing lights were appropriate, its decision was subject to the approval of the FHWA. *See* 23 C.F.R. § 646.214(b)(4) (1999). Once the FHWA approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby preempting respondent's claim.

*Id.* at 1477. Plaintiffs argue that the Supreme Court's decision was predicated on the fact that the TDOT specifically determined that warning devices other than

automatic gates and flashing lights were appropriate for the crossing at issue. I cannot agree with Plaintiffs' characterization of *Shanklin.*

First, the issue of whether preemption would exist in the absence of a finding by the State highway agency was not raised or addressed directly in *Shanklin.* However, that Court did say:

> Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, *is immaterial* to the preemption question.... What States cannot do—once they have installed federally funded devices at a particular crossing—is hold the railroad responsible for the adequacy of those devices.

*Id.* at 1476 (emphasis added).

Second, the Supreme Court in *Shanklin* merely observed that there was compliance with 23 C.F.R. § 646.214(b)(4), which states:

> For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, *whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.*

23 C.F.R. § 646.214(b)(4) (emphasis added). The regulation is clear that regardless of who makes the determination, FHWA must give the final approval.

In *Bryan v. Norfolk & W. Ry. Co.,* 154 F.3d 899 (8th Cir.1998), the Eighth Circuit addressed a claim almost identical to the one presented here. There, the plaintiff claimed that conditions were present at the site that required lights and gates, and because a diagnostic team had not examined the site and determined that gates were not appropriate, the issue was not preempted by federal law. The Eighth Circuit held:

Federal regulations are applicable if federal funds have been expended for the installation of the warning devices at the crossing.... After federally funded warning devices are installed and operating, federal preemption occurs.... *See also Steva v. Soo Line R.R. Co.,* No 96–4198, 1997 WL 381854, 117 F.3d 1423 (8th Cir.1997) (unpublished disposition) (holding that "[t]he federal government's funding of crossing devices implicitly indicates federal regulators have considered the devices' adequacy ....").... We continue to hold that once federal funds have been expended towards grade crossing safety devices, and those devices are installed and operating, state law negligence claims are preempted by federal regulations.

*Id.* at 902, 904.

Federal money paid for 90% of the installation of crossbucks at the Vanndale, Arkansas crossing. The State drew up the specifications for the installation of the crossbucks, and FHWA approved them. Federal funds have been expended toward grade crossing safety devices, and those devices were installed and operating. "The federal government's funding of crossing devices implicitly indicates federal regulators have considered the devices' adequacy ...." *Steva v. Soo Line R.R. Co.,* No. 96–4198, 1997 WL 381854, 117 F.3d 1423 (8th Cir.1997) (unpublished disposition).

Plaintiffs' arguments against preemption fail.

**b. Improper Maintenance of the Crossbucks**

Plaintiffs claim that, due to Defendant's failure to maintain the crossbucks, the crossbucks were not "operating" at the time of the accident. Plaintiffs argue that under the holding of *Kiemele v. Soo Line R.R. Co.,* 93 F.3d 472 (8th Cir.1996), inoperable crossbucks prevent preemption and allow a challenge to the adequacy of crossbucks to protect the crossing, i.e., opening

the door to a claim that lights and gates were appropriate.

Both parties agree that *Kiemele* allows a state law claim that the crossbucks are no longer adequate crossbucks. The question is whether *Kiemele* holds that a plaintiff may challenge whether crossbucks would be adequate even if they were working. In other words, to what extent is federal preemption erased?

In *Kiemele*, the plaintiffs ran into a train operated by Soo Line that was stopped on the crossing. The Kiemeles claimed the crossbucks were not reflective. The accident occurred at 7:00 p.m. in a heavy fog. The court found a fact issue existed as to whether the signs were "operating" at the time of the accident. "If [the signs] had lost their reflectivity, they were not operating, and Soo Line is not entitled to the benefit of federal preemption." *Id.* at 476. Thus, plaintiffs were allowed to present to the jury the issue of the "sufficiency of the warning." [6]

To understand what the Eighth Circuit meant by "sufficiency of the warning," it is necessary to examine *Kiemele*'s holding in light of the issue as it was framed by the appellants, the Kiemeles. The Kiemeles claimed that Soo Line had breached its duty by failing to maintain the crossbucks. *See id.* at 475. They did not argue that Soo Line had breached its duty by failing to install lights and gates. In other words, the Eighth Circuit ruled that the Kiemeles should have been allowed to proceed on their claim that the defendant's failure to maintain the crossbucks caused their accident.

The Eleventh Circuit has also recognized that a "failure to maintain" claim may not be preempted. *See Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271 (11th Cir.1996). The plaintiffs in *Michael* argued the weather was extremely foggy at the time of the accident. *Id.* at 272. The court held:

> The Supreme Court in *Easterwood* held that 23 C.F.R. §§ 646.214(b)(3) and (4), where applicable, preempt state tort law. However, those regulations deal with the design and installation of new warning devices, not the maintenance of those devices or the failure to warn the public of defective devices. Thus 23 C.F.R. §§ 646.214(b)(3) and (4) are not applicable to a *claim for negligent maintenance or for failure to warn*, and do not preempt such claims.

*Id.* at 273 (emphasis added).

Plaintiffs do not argue that the lack of reflectivity on the crossbucks caused their accident. In fact, they concede that they would be unable to establish proximate cause on such a claim. Rather, their argument is that, because the crossbucks were not working, under the holding in *Kiemele*, they should be allowed to present to the jury their argument that Defendant was negligent by not installing lights and gates. *Kiemele* does not support this, i.e., I believe that a proximate cause claim is necessary to invoke the *Kiemele* rationale.

### 2. Claims Based on Fraud, Deceit, Misrepresentation, and Assumption of a Duty under the Second Restatement of Torts, Section 324A

Plaintiffs argue that federal preemption would not bar claims based on fraud, deceit, and misrepresentation. However, they have not pled these claims in their Complaint. While they may allege them in their Amended Complaint, these issues are not properly before me now, and I do not reach them.

Plaintiffs argue that Union Pacific funds and sponsors Operation Lifesaver Inc. which tells people that they should "look, listen, and live" while informing people

---

6. This phrase was used by the Eighth Circuit in describing Soo Line's argument for preemption. "Soo Line further asserts that any claim regarding the *sufficiency of the warning* of the crossing is preempted by federal law because federal funds were used to upgrade Swenson's Crossing in 1981." *Kiemele,* 93 F.3d at 475 (emphasis added).

that lights and gates are ineffective, yet, the train does not blow its horn and cannot be seen until the motorist is on the track. Plaintiffs argue that Defendant's "efforts to dabble in crossing safety clearly places the railroad under the auspices of the Second Restatement of Torts, Section 324A" which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:

a) his failure to exercise reasonable care increases the risk of such harm, or

b) he has undertaken to perform a duty owed by the other to the third person, or

c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Again, however, Plaintiffs have not pled such a claim. While they may allege this claim in their Amended Complaint, it is not properly before me now.

### 4. Estoppel

Plaintiffs' final argument is that "[a]s a result of its conduct enumerated above, the railroad should be estopped from claiming preemption." Plaintiffs failed, however, to cite any authorities in support of this position or to provide a specific argument showing that estoppel would be justified. Plaintiffs' argument is, therefore, rejected.

### CONCLUSION

The facts in this case (taking the Plaintiffs' allegations as true) cause me to doubt

7. During the hearing held on Defendant's Motion for Summary Judgment, I granted Plaintiffs permission to file an Amended Complaint. However, all references in this Order to specific paragraphs of the Complaint refer to Plaintiffs' Original Complaint.

the wisdom of such sweeping preemption. I believe that a jury can better decide these issues than can a federal inspector; but this is a legislative decision, not a judicial one.

For the reasons stated above, Defendant's Motion for Partial Summary Judgment is GRANTED, and paragraphs 3(d), (e), and (f) of Plaintiffs' Complaint[7] are DISMISSED.[8]

8. This Order does not address whether claims of fraud, deceit, and misrepresentation, which Plaintiffs may state in their Amended Complaint, are preempted.