2003 OK 45

Juanita HIGHTOWER, as Guardian of the Person And Estate of William Franklin Pearl, An Incompetent Person, Plaintiff/Appellee,

v.

KANSAS CITY SOUTHERN RAILWAY CO., a Foreign Corporation, Defendant/Appellant.

J.T. Locke, and Jerry Hinds, Defendants.

No. 94,011.

Supreme Court of Oklahoma.

May 6, 2003.

Jerry L. McCombs and Jon Ed Brown of LeForce & McCombs, P.C., Idabel, OK, for plaintiff/appellee.

Kirkman T. Dougherty and J. Rodney Mills of Hardin, Jesson & Terry, Fort Smith, AK, for defendant/appellant.

LAVENDER, J.

¶ 1 The issues in the present cause are as follows: (1) whether Pearl's state law negligence theories based upon adequacy of the warning devices, excessive train speed and "local hazard conditions" are preempted by federal law such that the trial court's instructions on these issues were improper and (2) if so, whether the scope of federal preemption extends to bar evidence of adequacy of warn-

ing devices, excessive train speed and "local hazard conditions," which is offered for purposes of comparative negligence and punitive damages; (3) whether the trial court erred in instructing the jury to analyze the negligence of the parties on the basis of Oklahoma law of comparative negligence; and (4) whether the trial court erred in denying Railroad's motion for a directed verdict on the issues of liability and punitive damages.

## I

### FACTS AND PROCEDURAL HISTORY

¶ 2 William Franklin Pearl, a resident of LeFlore County, Oklahoma, was driving his 1997 pickup truck home subsequent to a shopping trip at 1 p.m. on December 16, 1997, whereupon his truck was struck by a train owned by Railroad and operated by its employees/Defendants Locke and Hinds, as Pearl was driving over the Pickering Street railway grade crossing in Mena, Arkansas. The crossing in question was a one-lane crossing and signs at the crossing included two reflectorized crossbucks warning signs [1] without gates and/or lights. The train at issue in this case was stationed out of Heavener, Oklahoma and was scheduled to return there on that date. The conductor Defendant and engineer Defendant were also residents of LeFlore County, Oklahoma.

¶ 3 This personal injury action was instituted on March 4, 1998 in the District Court of LeFlore County, in which Pearl sought compensatory damages for Defendants' neg-

---

**1.** The record indicates that directly adjacent to the road Pearl traveled on as he approached the Pickering Street Crossing, there were three warning signs, or passive devices (one round yellow sign with two black lines across the sign in the shape of an "X" with letters "R" and "R" on either side of the "X,") the next sign closer to the crossing was a diamond-shaped yellow sign indicating "CAUTION ONE LANE CROSSING ONLY," and the third sign was the crossbuck (pole with two white, rectangular shaped crossing signs at the top with black reflective lettering, which indicates "RAILROAD" and "CROSSING" on each rectangular crossing sign respectively). The crossbuck sign and posts were installed pursuant to Arkansas State Highway and Transportation Department specifications sometime in 1980. In addition to the requirement that the crossbuck signs be reflectorized, the

posts supporting such signs were designed to "break away" upon substantial impact, be installed "a minimum of 9 feet from the closest rail [and] 2 feet from the edge of the roadway or the edge of shoulder but not more than 12 feet unless otherwise directed by the engineer [for the Arkansas State Highway Commission]." *Arkansas State Highway Commission Plan of Proposed Railroad Crossing Signs (K.C.S.) Statewide, detail sheet.* Federal funds were used in implementation of this crossings improvement and was approved by the Federal Highway Administration sometime in 1980. Pearl raises no objection to the placement of or location of the crossbucks, but alleged in his Petition the insufficiency "of the crossbucks and/or other passive devices" and Railroad's negligence in its "fail[ure] to install crossing lights and/or gates and/or advance active warnings."

ligence and punitive damages for "gross and especially egregious negligence." Pearl's negligence claims are as follows [2]: (1) the Railroad failed to keep its right-of-way free from vegetative sight obstructions (hereinafter "the vegetation claim"); (2) the train was exceeding the federally mandated speed limit at the crossing (hereinafter the "excessive speed claim"); (3) the Railroad was exceeding a safe speed in light of the specific, individualized hazard the Railroad had created at the crossing [3]; and (4) the Railroad failed to provide an adequate warning to motorists of the presence of an approaching train in light of the abnormally dangerous nature of the crossing (also referred to by the parties as "the inadequate warning claim" or "ultrahazardous crossing claim").

¶ 4 On March 22, 1999, The Railroad filed a Motion for Partial Summary Judgment with respect to Plaintiff's negligence claims numbers 2 through 4, which were all negligence theories based upon issues of excessive train speed, the "ultra hazardous crossing" (adequacy of warning) claim, the audible warning signal claim and the "specific, individualized hazard" claim. The Railroad ar-

gued these theories of negligence were preempted by federal law. The trial court denied the Railroad's motion in part [4], ruling that controversy existed regarding material facts as to whether the conditions of the applicable federal regulations had been met as to adequacy of warnings, whether the train was traveling within the speed limit approved by the federal government and whether the crossing constituted a specific, individualized hazard such that would be exempted from federal preemption.[5]

¶ 5 This case was tried to a jury in October, 1999, which returned a verdict in favor of Defendants Locke and Hinds, but found that the Railroad was negligent in causing Pearl's injuries and awarded Pearl $1 million in compensatory damages. The jury determined that Pearl was also negligent, and apportioned the loss as 40 per cent attributable to him and 60 per cent attributable to the Railroad. Subsequent to a second-stage proceeding, the jury found the Railroad acted wilfully, wantonly and in reckless disregard for the rights of others and awarded Pearl $100,000 in punitive damages. Judgment

2. Pearl's Petition contained numerous allegations of negligence including claims for inadequate maintenance of crossing signals and failure of the Railroad to give an audible warning. Pearl expressly abandoned these claims in order to narrow the issues for trial. The only remaining negligence claims are the four listed here.

3. The parties refer to this same theory of negligence as the "local hazard," the "specific, individualized hazard," "specific, individual hazard" and/or "local safety hazard" interchangeably. Additionally, the COCA referred to this theory of negligence as the "local hazard conditions" and the "local safety hazard." For purposes of clarity, this theory of negligence will hereinafter be referred to as the "specific, individual hazard" claim.

4. The trial court granted the Railroad's Motion for Partial Summary Judgment in part regarding Pearl's claims for failure to sound an audible horn and failure to maintain the signals at the crossing in light of Pearl's express abandonment of these claims, as stated in Plaintiff's Response to Defendant's Motion for Partial Summary Judgment.

5. The trial court based its denial of Railroad's Motion for Partial Summary Judgment regarding the adequacy of warnings at least in part on the fact that no diagnostic team had inspected the

Pickering Street Crossing to make an individualized determination of adequacy. However, the U.S. Supreme Court has expressly provided that the federal regulations at 23 C.F.R. §§ 646.214(b)(3) and (4) apply regardless of whether there has been an "individualized determination of adequacy [of the particular warning devices at the crossing] by a diagnostic team or an FHWA official." *Norfolk Southern R. Co. v. Shanklin*, 529 U.S. 344, 356, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). Additionally, the trial court based its denial in part upon affidavits demonstrating the apparent lack of intent of the Federal Highway Administration that the spending of federal funds to bring a crossing up to Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD) compliance would raise a presumption of the warning device's adequacy. The U.S. Supreme Court has held that "MUTCD provides a description of, rather than a prescription for, the allocation of grade crossing safety between Federal and State Governments and between States and railroads." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 669–70, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Although *Easterwood* held that although the MUTCD does not displace state law on the subject of warning devices at crossings, it held that the federal regulations at 23 C.F.R. §§ 646.214(b)(3) and (4) do so, as they "establish requirements as to the installation of particular warning devices." *Id.* at 670, 113 S.Ct. 1732.

was entered on the jury verdict and the Railroad appealed.

¶ 6 The Court of Civil Appeals, Division IV (COCA) affirmed in part, reversed in part, and remanded for a new trial, holding that the trial court erred in instructing the jury regarding the adequacy of the warning devices, excessive train speed and on "local hazard conditions," as these claims were preempted by federal law. However, the COCA concluded that preemption does not extend to bar evidentiary proof of these theories for purposes of comparative negligence and punitive damages. Additionally, the COCA determined that upon remand, the jury should be instructed on Arkansas comparative negligence law rather than Oklahoma law. Further, the COCA affirmed the trial court's denial of Railroad's Motion for Directed Verdict on the issues of liability and punitive damages.

## II

### THE JURY INSTRUCTIONS

¶ 7 Review of trial court instructions is governed by 20 O.S.2001 § 3001.1, which provides as follows:

[n]o judgment shall be set aside or new trial granted by any appellate court of this state in any case ... on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

*Id.* We have held that in cases tried to a jury, where a jury is instructed on more than one issue and error affects one of the issues, "the error affecting one issue or theory in a case will be regarded as prejudicial where it is impossible to determine upon which of the two issues or theories the jury based its decision." *Bredouw v. Jones,* 1966 OK 93, 431 P.2d 413, 420 [6].

¶ 8 In this case, the jury was instructed on the abnormally dangerous nature of the crossing/adequacy of warning devices [7], excessive train speed/specific individual hazard (also referred to as "local hazard condition" claim, "specific individualized hazard claim" and/or "local safety hazard claim") [8]

---

6. We do not agree with Pearl's assertion in his Petition for Writ of Certiorari that 20 O.S. § 3001.1 has expressly and/or implicitly overruled *Bredouw v. Jones,* 1966 OK 93, 431 P.2d 413. The *Bredouw* case is still the law in Oklahoma. The rule enunciated in *Bredouw* is distinct from the rule applicable in non-jury trials and equity actions, which provides that the judgment of the trial court will not be reversed if it can be sustained upon *any* ground or theory of the case. *See Bredouw,* 431 P.2d at 420 (*and cases cited therein*). Pearl urges the application of this rule in this case, but to do so would clearly violate *Bredouw's* pronouncement that "this rule [applicable in equity cases and non-jury trials] will not be applied to sustain a jury verdict based upon an erroneous instruction." *Bredouw,* 431 P.2d at 420. Additionally, Pearl cites *Eversole v. Oklahoma Hosp. Founders Ass'n,* 1991 OK 80, 818 P.2d 456, and *Decorte v. Robinson,* 1998 OK 87, ¶ 9, 969 P.2d 358, 361, in his Petition for Writ of Certiorari in support of his assertion that the jury's verdict should be affirmed where there is *any* theory supported by competent evidence, which could serve as the basis for the verdict. However, we note that the rule enunciated in *Eversole* and *Decorte* is also inapplicable in this case, as that rule applies in the context of a properly instructed jury, which nevertheless reaches an allegedly inconsistent verdict.

7. This instruction on the abnormally dangerous nature of the crossing/adequacy of warning devices claim was instruction number 11, which provided as follows:

Plaintiff contends that the Pickering Street Crossing was abnormally dangerous, and she has the burden of proving this proposition.

If the Pickering Street Crossing is frequently used by the traveling public, if trains pass over it frequently and if the crossing is so dangerous because of surrounding circumstances that a reasonable careful person could not use it with reasonable safety in the absence of special warnings, then it would be an abnormally dangerous crossing. Whether the Pickering Street Crossing was abnormally dangerous is for you to decide.

If you find that the Pickering Street Crossing was abnormally dangerous, as I have defined that term, then it was the duty of Kansas City Southern Railway Company to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety.

8. This instruction on excessive train speed/specific, individual hazard was instruction number 12, which provided as follows:

Plaintiff contends that Kansas City Southern Railway Company created a specific, individualized hazard at the Pickering Street Crossing and

and track classification [9] of the crossing in question. The COCA determined that the trial court erred in instructing the jury on these claims, as these claims were preempted by federal law. As will be discussed in more detail in this opinion, we agree with the COCA that federal law preempts these claims and the trial court erred in instructing the jury as to them. However, the COCA concluded that the jury was properly instructed on the vegetation claim, and we do not disturb that determination.[10] The jury's verdict in this case fails to specify whether the jury based its decision upon the properly submitted vegetation theory or upon one of the several improperly submitted theories of negligence. Thus, it is impossible to discern upon which theory or theories the jury based its decision to find Railroad negligent and thus, the error affecting those several theories of negligence is deemed prejudicial pursuant to the rule in *Bredouw*, and probable that the error resulted in a miscarriage of justice within the meaning of 20 O.S. § 3001.1. Therefore, the Railroad is entitled to a new trial in order to avoid a miscarriage of justice in this matter.

¶ 9 The Railroad additionally argued, and the COCA agreed, that the trial court erred in instructing the jury on the issue of comparative ·negligence according to Oklahoma law instead of Arkansas law.[11] We

---

that the railroad had duty to slow its train to avoid such a hazard. The mere fact that a train is being operated at a high rate of speed is not in itself negligence. However, under certain circumstances the speed of a train may be so unreasonable as to constitute negligence. It is for you to decide whether a specific, individualized hazard existed at the Pickering Street Crossing creating a circumstance that made the speed of the train in this case unreasonable.

9. With respect to Pearl's excessive speed claim, the trial court gave the instruction on track classification in order to permit the jury to determine whether the track should have been classified in a lower class such that would result in a corresponding lower maximum allowable speed for that class. The track classification instruction (instruction # 13 at trial) contained virtually verbatim content of the federal regulation on track classification (49 C.F.R. § 213.9 (2002)), which provided as follows:

There was in force in the State of Arkansas at the time of the occurrence a federal regulation which provided:

[T]he following maximum allowable operating speeds apply for freight trains:

| | |
|---|---|
| Excepted track | 10 mph |
| Class 1 track | 10 mph |
| Class 2 track | 25 mph |
| Class 3 track | 40 mph |
| Class 4 track | 60 mph |

If a segment of track does not meet all of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet all of the requirements of this part.

10. Railroad has failed to raise or otherwise preserve any objection to the vegetation claim in any of its assignments of error, briefs and/or certiorari materials before this Court. Thus, we do not address the propriety of this instruction, nor do we address whether federal law preempts this tort law claim. However, it has been held that federal law preempts common law tort claims predicated on a railroad's failure to control vegetation adjacent to railroad crossings so long as the railroad complies with the federal vegetation regulation (49 C.F.R. § 213.37(b) (2002)). *O'Bannon v. Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1423 (W.D.Mo.1997) (citations omitted).

11. The trial court instructed the jury (instruction numbers 6–9) regarding Oklahoma negligence law pursuant to the Oklahoma Uniform Jury Instructions (hereinafter OUJI–Civ. (2d)) 9.1 (Negligence—elements of liability), 9.2 (Negligence defined), 9.6 (Direct Cause—definition), 9.7 (Concurrent causes), but instructed the jury (numbers 14–16) pursuant to Arkansas "rules of the road" concerning duties of drivers of motor vehicles with respect to railroad grade crossings. The trial court gave instruction number 21 on Oklahoma comparative negligence law and instruction number 22 on Oklahoma law regarding "comparative negligence not a defense to willful and wanton" pursuant to OUJI–Civ. (2d) 9.17, 9.19 and 9.17A. The distinction between Oklahoma and Arkansas law on comparative negligence arises if the jury were to determine that the negligence of the parties is equivalent. Railroad urges the application of Arkansas comparative negligence law in this instance. Arkansas law bars a plaintiff from recovery when plaintiff's negligence *is equal to or greater than* the negligence of defendant's negligence. ARK.CODE ANN. § 16–64–122 (Michie 1987). Thus, if the jury were instructed on Arkansas comparative negligence law and it determined Pearl's negligence was 50 per cent—equivalent to Railroad's negligence—Pearl would therefore be barred from any recovery under Arkansas law. However, under Oklahoma law, a plaintiff may recover from a defendant, whose negligence is of equal degree to plaintiff's own negligence, since Oklahoma law bars plaintiff's recovery only if plaintiff's own negligence is of a greater degree than defendant's negligence. 23 O.S.2001 § 13.

disagree and hold that the trial court correctly instructed the jury on Oklahoma negligence and comparative negligence law.

¶ 10 This Court has held "that the rights and liabilities of parties with respect to a particular issue in tort should be determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *Brickner v. Gooden,* 1974 OK 91, 525 P.2d 632, 637. In this case, while the COCA determined that upon remand, the jury should be instructed pursuant to the law of Arkansas regarding comparative negligence, the COCA refrained from disturbing the trial court's determination that the jury be instructed pursuant to Oklahoma negligence law. To the extent the COCA treated negligence and comparative negligence as separate and distinct issues, this was in err. For purposes of choice of law analysis under *Brickner v. Gooden,* where the affirmative defense of comparative negligence is raised in a negligence action, they are to be treated as the same "particular issue in tort." The same state's laws with the most significant relationship to the occurrence and the parties regarding negligence should also be the same state with the most significant relationship to the occurrence and the parties with respect to defenses thereto.

¶ 11 In *Brickner,* this Court expressly abandoned the *lex loci delicti* rule (the law of the place of the wrong), which previously determined the applicable substantive law for tort actions brought in Oklahoma. *Id.* To determine the state with the most significant relationship to the occurrence and the parties, the *Brickner* case identified four factors to be considered "according to their relative importance with respect to a particular issue" as follows: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred." *Id.*

¶ 12 In this case, the motor vehicle-train collision occurred in Arkansas. However, both Mr. Pearl and his guardian, Juanita Hightower, as well as Defendants J.T. Locke and Jerry Hinds are all residents of LeFlore County, Oklahoma. Thus, all individual parties to this lawsuit reside in Oklahoma. At the time of the collision, Mr. Pearl was driving home from a shopping trip, which had begun in Oklahoma and was to end in Oklahoma. Although the Railroad owns property located in LeFlore County, Oklahoma, the Railroad's state of incorporation and its principal place of business is in a state other than Oklahoma or Arkansas. The train at issue in this case was stationed out of Heavener, Oklahoma. Further, at the time of the collision in this case, the train was traveling on a trip, which began in Oklahoma and was scheduled to return to Oklahoma.

¶ 13 The Railroad urges an application of the "most significant relationship test" that would result in resurrection of the *lex loci delicti* rule, as it argues there is no other significant relationship between the parties in this case other than the fact they were each involved in the accident in Arkansas. The Railroad urges a construction of the test that focuses upon the fact the collision occurred in Arkansas as the sole factor in the determination of which state's law has the most significant relationship to the occurrence and the parties. However, the proper consideration of the other *Brickner* factors indicates it is Oklahoma law, which clearly has the most significant relationship to the occurrence and the parties in this case with respect to negligence and comparative negligence.

¶ 14 The *Brickner* case arose out of an airplane crash, which occurred in Mexico. The injured passengers brought actions against the individual owner and operator of the airplane for personal injuries sustained in the crash. In its application and evaluation of the various factors in *Brickner,* this Court noted that "all the parties were and still are residents of Oklahoma; the aircraft was hangared and registered in Oklahoma; and the trip originated and was to end in Oklahoma." *Id.* at 638. While the *Brickner* Court acknowledged that the Republic of Mexico "would be concerned with the conduct of the parties while they were within its borders and the accident occurred in Mexico," it noted that " 'it would seem rather undesirable

that the rights and obligations of the parties should be subject to change as the aircraft crossed the boundary lines of each jurisdiction.'" *Id.* Thus, the *Brickner* Court determined that Oklahoma had the most significant relationship to the occurrence and the parties in that case and that Oklahoma law, rather than the law of Mexico, would therefore apply in that case.

¶ 15 The facts and application of the factors in *Brickner* are directly analogous in the instant case. Just as in *Brickner*, all individual parties in this case are residents of Oklahoma. Additionally, just as the aircraft in *Brickner* was hangared in Oklahoma, the train in this case was stationed out of Heavener, Oklahoma and both the train and Mr. Pearl were each originating their respective trips from Oklahoma and likewise, each were planning on ending their respective trips in Oklahoma on the day of the collision. In this case, it would likewise "seem rather undesirable that the rights and obligations of the parties should be subject to change as the [train] crossed the boundary lines of each jurisdiction." *Id.* Thus, pursuant to the rule in *Brickner*, the laws of Oklahoma have the most significant relationship to the occurrence and the parties and Oklahoma law of negligence and comparative negligence should therefore apply to determine the parties' rights and liabilities in this case. Upon remand, the trial court shall apply Oklahoma law on negligence and comparative negligence when it instructs the jury.

## III

### FEDERAL LAW PREEMPTS PEARL'S THEORIES OF NEGLIGENCE PREMISED UPON INADEQUATE WARNING DEVICES, EXCESSIVE TRAIN SPEED AND LOCAL HAZARD CONDITIONS

#### Background on the Federal Law Relating to Railroad Safety

¶ 16 The Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. §§ 421–447 (now codified at 49 U.S.C. § 20101 (2000), *et seq.*) was enacted for the express purpose of "promot[ing] safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents." 45 U.S.C. § 421 (49 U.S.C. § 20101). Additionally, the FRSA directed the Secretary of Transportation to address safety problems at grade crossings and was given broad powers to "prescribe regulations and issue orders for every area of railroad safety." 45 U.S.C. § 431(a) (49 U.S.C. § 20103(a)). This legislation expressly provides for the federal preemption of State law as follows:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

45 U.S.C. § 434 (49 U.S.C. § 20106). This Act also contains an express "savings clause," which provides as follows:

> A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an *essentially local safety hazard;*
>
> (2) is not incompatible with a law, regulation, or order of the United States government; and
>
> (3) does not unreasonably burden interstate commerce.

*Id.* (emphasis added). Pursuant to the FRSA, in 1971, The Secretary of Transportation issued regulations, which set maximum allowable train speeds corresponding to track classification. 49 C.F.R. § 213.9 (2002).[12]

¶ 17 In 1973, the Highway Safety Act was enacted, which created the Federal Railway–Highway Crossings Program (The Crossings Program). 23 U.S.C. § 130 (2000). The Crossings Program makes federal funds

---

**12.** This regulation regarding track classification was provided to the jury in its entirety in instruction number 13, *supra* at note 9. Track classification is based upon numerous factors such as the track's "gage, alignment, curvature, surface uniformity, and the number of cross ties per length of track." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *see* 49 C.F.R. §§ 213.51–213.143 (2002).

available to the States for improvement and elimination of hazards at grade crossings on the condition of States' "maint[enance of] a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d).[13] The Secretary, through the Federal Highway Administration (FHWA), issued several regulations pursuant to the FRSA and the Highway Safety Act in implementation of the Crossings Program including the federal regulation requiring that the warning devices at crossings must comply with standards set forth in the FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD). 23 C.F.R. §§ 646.214(b)(1), 655.603.[14] Additionally, federal regulations implementing the Crossings Program specifically addressed the design of grade crossing improvements. *See* 23 C.F.R. § 646.214(b). When the conditions contained in these regulations are applied, they establish the requisite "adequate warning devices" to be installed where "[f]ederal-aid funds participate in the installation of the devices." §§ 646.214(b)(3) and (4).[15]

## A. Excessive Train Speed Theory

■ ¶ 18 Two of Pearl's four negligence theories are based upon the premise that the train in question was traveling at an excessive speed at the time of the accident. Pearl specifically claims that the train was exceeding the federally mandated speed limit at the crossing (hereinafter the "excessive speed claim") and the Railroad was exceeding a safe speed in light of the specific, individualized hazard the Railroad had created at the crossing.

¶ 19 It is undisputed that the train at issue in this case was traveling 40 miles per hour at the time of the accident. Further, the record reflects that at the time of the accident, the track was classified pursuant to federal regulation as a Class 3 track, which has a maximum allowable speed of 40 miles per hour.[16]

13. Additionally, federal regulations require States receiving federal aid to consider and rank the dangers posed by grade crossings, noting that "special emphasis shall be given to the legislative requirement that all public crossings be provided with standard signing." 23 C.F.R. § 924.9(a)(4) (2002). In addition to this direction to the states, the FRSA also directs the Secretary of Transportation to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." 49 U.S.C. § 20134 (2000).

14. The U.S. Supreme Court has held that § 646.214(b)(1), which requires that all traffic control devices installed under the program comply with MUTCD, does not preempt state tort actions. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 668–70, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Further, the Supreme Court ruled that MUTCD "provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between Federal and State Governments and between States and railroads." *Id.* at 669–70, 113 S.Ct. 1732.

15. Sections 646.214(b)(3) and (4) provide in full:
 (3)(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
 (A) Multiple main line railroad tracks.
 (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
 (C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
 (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
 (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
 (F) A diagnostic team recommends them.
 (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.
 (4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

16. The record contains evidence indicating that in November of 1997, the classification of the track through the City of Mena was to be upgraded from Class 3 to Class 4, with a corresponding increase in the maximum allowable speed pursuant to the federal regulations from 40 miles per hour to 60 miles per hour.

¶ 20 Since the train was traveling within the speed limit established in the federal regulations, Pearl's common law negligence claims premised upon excessive train speed are therefore preempted by federal law. The Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. §§ 421–447 expressly preempts all Pearl's claims based upon excessive train speed. Further, the U.S. Supreme Court has held that the maximum allowable speeds codified at 49 C.F.R. § 213.9(a) "cover[ ] the subject matter of train speed with respect to track conditions, including conditions posed by grade crossings," and therefore, preempt common law tort claims asserting the train traveled at an excessive rate of speed. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Thus, pursuant to the FRSA and the rule in *Easterwood*, all Pearl's excessive train speed claims are preempted.

■ ¶ 21 Pearl has sought to circumvent federal preemption by arguing that the track should have been classified at a lower classification and therefore, a lower speed limit should have been applicable at the time of the accident. Pearl argued that the jury was entitled to determine the class of track and its corresponding speed limit. The trial court agreed and instructed the jury on this issue. The COCA held the trial court erred in giving this instruction and this Court agrees. The federal regulations explicitly place the responsibility of the determination whether to lower a track's classification (and the track's corresponding speed limit) upon either a Federal Railroad Administration Track Inspector or a State Track Inspector. 49 C.F.R. § 216.15(a). That regulation provides in pertinent part as follows:

> When an FRA Track Inspector or State Track Inspector determines that track does not comply with the requirements for the class at which the track is being operated ... he notifies the railroad in writing that the track is being lowered in class and that operations over that track must comply with the speed limitations prescribed in part 213 of this chapter.

49 C.F.R. § 216.15(a). Pursuant to this federal authority, the determination of whether to lower the track classification and its corresponding speed limit is clearly for the FRA track inspector and/or State Track Inspector rather than a question of fact for the jury. "Federal law provides ... the decision to downgrade a track belongs to the FRA track inspector." *Stevenson v. Union Pac. R.R. Co.*, 110 F.Supp.2d 1086, 1092 (E.D.Ark. 2000).

■ ¶ 22 In *Stevenson*, the plaintiffs argued that a track should have been downgraded and a corresponding lower speed limit should have been implemented prior to the motor vehicle-train accident at issue in that case due to "a number of track conditions found in the area including the specific local hazard." *Id.* at 1091. The *Stevenson* court rejected this argument, reasoning that "Plaintiffs are attempting to reclassify the track after the fact. This is an impermissible collateral attack on the regulatory process." *Id.* In this case, the record is absent any evidence of either a FRA Track Inspector and/or State Track Inspector's determination that the track in question did not meet the requirements of a class 3 track. Further, there is no evidence of any written notification to the Railroad of any federal or state inspector's determination in this case that a lowering in track classification was warranted. In fact, The Federal Railroad Administration inspection report of January 22, 1997 [17] indicates the FRA Inspector inspect-

---

17. The FRA Inspection Report of January 22, 1997 was Plaintiff's Exhibit # 279 at trial. This report documents the fact that this track was classified as Class 3 with a maximum allowable speed for this track of 40 miles per hour. This report also reflects the FRA Inspector's findings of "poor subgrade conditions (track pumping/mud, at several locations) due to drainage facitly [sic], mainly at rd. xings, and in rock cuts." However, the inspection report further expressly provides that the FRA Inspector noted "no violation recommended" in addition to no-tation of retention of Class 3 and speed limit of 40 m.p.h., which documents the FRA Inspector's decision to refrain from downgrading the track to a lower track classification despite the existence of the noted defect. The inspection report further notes that the FRA Inspector did not require the Railroad to provide written notification to the FRA regarding correction of this defect, but instead, indicated that such written notification to the FRA of remedial action as "optional." The inspector's notation of a defect,

ed the track in Mena, Arkansas at that time, noted the presence of defects, but expressly indicated there were no violations, and no reduction in track classification at that time. Just as the plaintiff's attempt in *Stevenson* failed, Pearl's attempt to re-classify the track after the fact in this case likewise fails as an impermissible collateral attack on the regulatory process.

## B. The "Local Hazard" Claim/Specific, Individual Hazard Exception

¶ 23 Pearl additionally argues that the crossing presented a "specific, individualized hazard" that required the train's speed to be reduced as it approached the crossing. As noted above, federal preemption under § 20106 of excessive train speed claims is not absolute, as the statute contains an express "savings clause." The U.S. Supreme Court has held that common law speed restrictions are not preserved by the "savings clause" within the federal statute, the terms of which allows States to "adopt or continue in force an additional or more stringent law ... related to railroad safety when the law ... is necessary to eliminate or reduce an essentially local safety hazard." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993);[18] 49 U.S.C. § 20106.[19] The *Easterwood* Court specifically refrained from ruling on the question of federal preemption of a "suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Easterwood,* 507 U.S. at 675, n. 15, 113 S.Ct. 1732. Courts construing *Easterwood* have interpreted this pronouncement as the "specific, individual hazard" exception to federal preemption. Thus, where it is determined that a "specific, individual hazard" exists, a state tort law action survives for breach of the duty to slow or stop the train to avoid such a hazard. While the *Easterwood* footnote distinguished the "specific, individual hazard" from the "essentially local safety hazard" savings clause of the federal statute, the U.S. Supreme Court refrained from further defining the hazard or hazards that would constitute the specific, individual hazard such that would qualify for exception to federal preemption.[20] Subsequently, other courts including this one in

while also indicating "no violation" in addition to notation of the inspector's decision not to lower the track's classification/speed and finally, indication that notification to the FRA of the Railroad's correction of the defect as "optional" all reflect the FRA Inspector's determination that the noted defect was either minor in character or at least not material enough to warrant notation of violation, lowering of class/slowing of train speed and/or mandating that the Railroad provide the FRA with written notice of remedial action regarding that defect. Plaintiff's expert witness, Dr. William Berg testified that this defect necessitated downgrading of the track to Class 2 and corresponding lower speed until the defect was corrected. The inspection report clearly reflects a decision on the part of the FRA Inspector to refrain from lowering the track to Class 2. If the defect had been of a nature that would warrant indication of violation and lowering of the track classification, not only would the inspection report so state, but the Railroad would have been required to provide written notification to the FRA Regional Administrator "when the track is restored to a condition permitting operations at speeds authorized for a higher class, specifying the repairs completed." 49 C.F.R. § 216.15(b).

18. The plaintiff's negligence theory against the railroad in *Easterwood* was that even if the train was traveling within the speed limit established by the federal regulations, the railroad could still be liable for breach of its common law duty to operate the train at a safe speed given the "time and place." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 675, n. 15, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The U.S. Supreme Court in *Easterwood* rejected this argument and held this claim was not preserved by the statutory savings clause. *Id.*

19. To the extent that Pearl argues, just as the plaintiff argued in *Myers,* that the conditions at the Pickering Street Crossing at the time of the collision "constituted an essentially local safety hazard, which the state could have regulated had it chosen to do so is immaterial because there is no evidence that the state [of Arkansas] did so." *Myers v. Missouri Pac. R.R. Co.,* 2002 OK 60, ¶ 25, 52 P.3d 1014, 1025 (Okla.2002). The U.S. Supreme Court in *"Easterwood* makes clear that state tort law does not address local safety hazards in the sense contemplated by § 20106.... The saving clause of § 20106 does not contemplate the survival of an excessive speed claim based upon the generalized application of state tort law to what are characterized as ultrahazardous conditions." *Myers,* ¶ 25, 52 P.3d at 1025–26 (Okla.2002).

20. The parties in this case describe Pearl's tort law theory in this instance as the "local hazard," "local safety hazard," and/or "specific, individual hazard" claim and use these terms interchangeably, as do many courts addressing the

*Myers v. Missouri Pac. R.R. Co.*, 2002 OK 60, ¶ 27, 52 P.3d 1014, have addressed what hazards and/or conditions constitute a specific, individual hazard,[21] and likewise have determined which conditions at crossings do not constitute a specific, individual hazard.[22]

¶ 24 Pursuant to *Easterwood* and upon consideration of "the various views espoused in its progeny," this Court in *Myers* held "that a specific, individual hazard is a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing and which is not capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations." *Myers*, 2002 OK 60,

"savings clause" as well as the exception to federal preemption established in *Easterwood*. For discussion of questions left unanswered by *Easterwood*, *see Myers v. Missouri Pac. R.R. Co.*, 2002 OK 60, 52 P.3d 1014, 1026, n. 43 (Okla.2002).

**21.** Courts subsequent to *Easterwood* have acknowledged an exception to federal preemption in circumstances where a specific, individual hazard exists. In *O'Bannon v. Union Pac. R.R. Co.*, the court noted that "[g]enerally, courts considering this issue have ruled that a 'specific individual hazard' must be a discrete and truly local hazard.... They must be aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA.... The 'local hazard' cannot be statewide in character and cannot be capable of being adequately encompassed within uniform, national standards.... An alternative, expansive construction of the local safety hazard language would excessively preserve local speed regulations and significantly undermine the Secretary's ability to prescribe uniform operational speeds." 960 F.Supp. 1411, 1420–21 (W.D.Mo.1997) (citations omitted). However, courts have failed to uniformly determine what constitutes a "specific, individual hazard." *See, e.g., Bashir v. National R.R. Passenger Corp.*, 929 F.Supp. 404 (S.D.Fla. 1996), *aff'd*, 119 F.3d 929 (11th Cir.Fla.1997) (holding that the railroad's negligent failure to stop the train prior to striking a child standing on the track is not preempted); *Shaup v. Frederickson*, 1998 WL 726650 (E.D.Pa.1998), (holding that the exception enunciated by the *Easterwood* Court "encompasses the avoidance of a specific collision. Upon realizing that a car, pedestrian, or other obstruction is unable to extricate itself from an impending collision with on-coming train, the operator has a common law tort duty to slow or stop a train to avoid a collision."); *Bakhuyzen v. National R.R. Passenger Corp.*, 20 F.Supp.2d 1113, 1118 (W.D.Mich.1996) (holding a snowstorm constituted a specific, individual hazard such that train conductor had the duty to slow the train since weather conditions cannot be adequately encompassed within uniform national standards); *Griffin v. Kansas City S. Ry. Co.*, 965 S.W.2d 458, 461 (Mo.App.1998)(providing that an "unwavering approach" of a vehicle that the train crew either knew or should have known about is a specific, individual hazard); *Missouri Pac. R.R. Co. v. Lemon*, 861 S.W.2d 501, 510 (Tex.App.1993)(holding that illegally and improperly parked tank cars obstructing view of the crossing created a specific, individual hazard);

*Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 242 (Mo.2001) (holding that "an unwavering approach by a vehicle at a railroad crossing, where the engineers knew or should have known that a collision was imminent, is a specific, identifiable hazard.") In such cases, the courts have determined that federal law does not preempt the plaintiff's claim against the railroad for breach of the duty to stop or reduce a train's speed below the federal maximum speed limit. This Court agrees with the pronouncements in *Bashir, Shaup, Bakhuyzen* and *Alcorn*, which have narrowly construed "specific, individual hazard" as an "avoidance of an imminent collision with a specific person or object." *See Myers v. Missouri Pac. R.R. Co.*, 2002 OK 60, 52 P.3d 1014, 1026–027, n. 44–45. (Okla.2002).

**22.** *See Myers v. Missouri Pac. R.R. Co.*, 2002 OK 60, ¶ 28, 52 P.3d 1014, 1028 (Okla.2002). Conditions which do not constitute specific, individual hazards would merely fall within the auspices of federal law and excessive train speed claims arising in the context of such conditions would therefore be preempted. *See O'Bannon*, 960 F.Supp. at 1421 (holding the lack of active warning devices at the crossing, the steep grade and angle of the crossing and proximity to the highway are conditions which do not constitute a specific, individual hazard, but rather are "all general conditions of crossings that are amenable to uniform, national standards ... defects related to [which] are already accounted for in the Secretary's regulations governing maximum operational speeds."); *Herriman v. Conrail, Inc.*, 883 F.Supp. 303, 307 (N.D.Ind.1995)(holding that the artificial lights on nearby building did not constitute a specific, individual hazard because such lights were continuously present at the crossing); *Earwood v. Norfolk S. Ry. Co.*, 845 F.Supp. 880, 887 (N.D.Ga.1993)(holding the conditions at the intersection of multiple tracks and rail cars obstructing the view are not specific, individual hazards); *Steva v. Soo Line R.R. Co.*, 117 F.3d 1423, 1997 WL 381854 (8th Cir.1997) (unpublished disposition) (holding high traffic volume, lack of active warning device, grade and angle of the crossing and surrounding vegetation did not constitute a specific, individual hazard); *Stevenson v. Union Pac. R.R. Co.*, 110 F.Supp.2d 1086 (E.D.Ark., 2000) (holding factors such as limited sight distances, vegetation along the track, passive warning devices at the crossing and history of accidents at the crossing do not constitute specific, individual hazard).

¶ 27, 52 P.3d at 1027. A specific, individual hazard "refers to a unique occurrence which could lead to a specific and imminent collision and *not to allegedly dangerous conditions at a particular crossing.*" *Id.* at 1028 (emphasis added). Additionally, *Myers* identified certain hazards and factors that would not constitute a "specific, individual hazard" as follows:

> Hazards posed by track conditions, including those existing at grade crossings, are capable of being taken into account by the Secretary and are covered by the federal speed regulations. Factors such as general knowledge that a crossing is dangerous, traffic conditions, a crossing's accident history, sight distances, multiple crossings in close proximity, sun glare, *a railroad's internal policies regarding speed,* and inadequate signal maintenance are *not* specific, individual hazards.

*Id.* (emphasis added).

¶ 25 In this case, Pearl argues the Railroad's alleged failure to "keep a promise" regarding its increase of train speeds and corresponding adjustment of warnings it would provide motorists driving over crossings in Mena, Arkansas amounts to a "specific, individualized hazard."[23] Pearl argues the Railroad made "false representations" that it would increase train speed incrementally and it would implement certain protective measures to ensure local citizens had the same advance warning times that they had under the lower speeds. Warning devices were never altered in accordance with the alleged "promises," and Pearl asserts that such promises had prevented local government from implementing their own safety measures. Thus, Pearl asserts these false representations created a "specific, individualized hazard" at the Pickering Street Crossing.

¶ 26 The record reveals that Pearl's "specific, individual hazard" theory is based entirely on the Railroad's internal speed regulations, which set a lower speed limit than the maximum allowable speed limit mandated by federal law, as referenced in a letter the Railroad's General Superintendent sent to the Mayor of Mena, Arkansas on November 11, 1997 regarding the Railroad's internal policies.[24] While the record suggests that the Railroad may have violated its own internal speed limit in traveling at 40 miles per hour at the time of this collision, this speed was clearly within the maximum speed limit established by federal law for a Class 3 track. Internal speed limits set by the Railroad are not "a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing" incapable "of being taken into account by the Secretary of Transportation." *Id.* at 1027. Clearly, train speed limits are capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations, since this is exactly what the Secretary has done in establishing classifications of tracks and corresponding maximum speed limits. Such internal speed limits are not a "unique occurrence which could lead to a specific and imminent collision" and "have nothing to do with the avoidance of a

---

**23.** Pearl also argues the existence of sub-grade defect in support of his argument that the jury should be allowed to determine whether the classification of the track and corresponding speed limit should have been lower at the time of the collision in this case. However, Pearl does not assert this defect or other conditions at the crossing constitute a specific, individual hazard. Pearl's Petition alleged generally that the Railroad operated its "train at a high, unsafe and unreasonable speed in light of the specific individualized hazards existing at the Pickering Street grade crossing, all of which were known to them."

**24.** Plaintiff's Exhibit 124(B) is a letter of November 11, 1997 from Terry L. Reardon, General Superintendent for the Railroad to the Honorable Henry G. Sunderman, Mayor of Mena Arkansas. This letter provided that the Railroad has "recently completed a 10 year track infrastructure improvement program," and that as a result, the tracks through Mena, Arkansas have been upgraded to "FRA Class 4. The Federal Railroad Administration, which has exclusive jurisdiction to regulate the speed of interstate railroads, has established a speed limit for Class 4 track of 59 miles per hour." In accordance with the increase in the federal speed limit, the letter further advised of the Railroad's plan to increase its internal "current maximum speed of 20 miles per hour to our target maximum speed of 40 miles per hour. KCS will not increase the speed of its trains until after all of the signals in Mena have been adjusted to provide the same advance warning as is currently provided."

specific collision" such that would fall within the definition of "specific, individual hazard," as defined in *Myers. Id.* at 1028. Further, this Court expressly provided that "a railroad's internal policies regarding speed" do not constitute a specific, individual hazard. *Id.; See also St. Louis Southwestern Ry. Co. v. Pierce,* 68 F.3d 276 (8th Cir.1995) (holding that despite railroad's violation of its self-imposed speed limit, which was lower than federal law, the fact that the train was traveling within the maximum speed limit allowed by federal law thus triggers preemption of any negligence action against railroad based upon alleged excessive train speed). In accordance with these authorities, we find that Pearl's "specific, individual hazard" or "local hazard claim" is merely a cloak for his excessive train speed theory of negligence, which federal law clearly preempts.

### C. The Inadequate Warning Device Theory

 ¶ 27 Pearl's fourth negligence theory is premised upon the Railroad's alleged failure to provide an adequate warning to motorists of the presence of an approaching train in light of the abnormally dangerous nature of the crossing (hereinafter "the inadequate warning" claim). As discussed *supra* in introduction to Part III of this opinion, federal regulations implementing the Crossings Program addressed the design of grade crossing improvements. 23 C.F.R. § 646.214(b). These regulations specify what constitutes "adequate warning devices," which must be installed at crossings "where Federal-aid funds participate in the installation of the devices." §§ 646.214(b)(3) and (4). The U.S. Supreme Court has held that when federal funds participate in the crossing im-

provement project, these regulations "establish a standard of adequacy that 'determines the devices to be installed.'" *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 354, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000)· (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 671, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)). Both *Easterwood* and *Shanklin* held that where §§ 646.214(b)(3) and (4) "are applicable, state tort law is preempted." *Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732; *Shanklin,* 529 U.S. at 352, 120 S.Ct. 1467.

¶ 28 In *Easterwood,* the U.S. Supreme Court determined that the federal regulations were inapplicable in that case because although federal funds had been obtained for placement of warning devices at the crossing in question, those warning devices were never actually installed. *Easterwood,* 507 U.S. at 671–73, 113 S.Ct. 1732. In light of *Easterwood,* the *Shanklin* Court held that these federal regulations are applicable to all warning devices actually installed with federal funds and that the applicability of these regulations does not depend "on any individualized determination of adequacy by a diagnostic team or an FHWA official." *Shanklin,* 529 U.S. at 356, 120 S.Ct. 1467.

¶ 29 The record reflects that pursuant to an Arkansas Crossings Improvement Program in 1980, federal funds were used to install the crossbucks warning signs at the Pickering Street Crossing and that such warning signs remained present at the crossing at the time of the collision in the instant case. The record also reflects that this use of federal rail-highway monies for this project was approved by the Federal Highway Administration, thus satisfying the conditions of § 646.214(b)(4).[25] Since federal funds

---

25. Under the terms of §§ 646.214(b)(3) and (4), if a crossing presents the conditions listed under (b)(3), the State must install automatic gates and flashing lights. If the conditions listed under (b)(3) are absent, (b)(4) mandates that the decision as to what particular devices to install is subject to FHWA approval. *Shanklin* provides that contrary to the FHWA's own position that the regulations required an individualized determination of adequacy by a diagnostic team or FHWA official, the *Shanklin* Court held that such federal approval need *not* be obtained subsequent to "diagnostic studies and a particularized analyses of the conditions" at a particular cross-

ing. *Shanklin,* 529 U.S. at 355–56, 120 S.Ct. 1467. The *Shanklin* Court recognized that it was rejecting the FHWA's own understanding of the application of these regulations, while noting the FHWA's interpretation of these regulations was "inconsistent with the text of §§ 646.214(b)(3) and (4)." *Id.* at 356, 120 S.Ct. 1467. In this case, although the federal approval of the warning devices may not have been based upon an individualized determination and/or diagnostic study, the rule in *Shanklin* is clear that this general federal approval was sufficient to trigger application of the federal regulations and federal preemption.

were used in the installation of warning devices actually installed at the Pickering Street Crossing, the conditions to applicability of §§ 646.214(b) were met in this case, thus triggering federal preemption pursuant to *Shanklin* and *Easterwood.* Because the federal regulations apply in this case with respect to the crossbucks at the crossing, this warning device meets the federal "standard of adequacy," and such federal standard thereby "displaces state and private decision-making authority." *Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732 *Shanklin,* 529 U.S. at 354, 120 S.Ct. 1467. Any state law or rule that "more or different crossing devices were necessary at [this] federally funded crossing is therefore preempted." *Shanklin,* 529 U.S. at 355, 120 S.Ct. 1467. Pursuant to these authorities, the warning devices present at the Pickering Street Crossing are deemed adequate as a matter of federal law and

Pearl's negligence theory premised upon the Railroad's failure to provide an adequate warning is thereby preempted.

## IV

## EVIDENCE PERTINENT TO PREEMPTED THEORIES OF NEGLIGENCE

¶ 30 Although the COCA correctly determined that Pearl's *claims* based on inadequate warnings, excessive train speed and "local hazard conditions"/"local safety hazard" [26] were preempted by federal law, it erred in its holding that *evidence* pertinent to these theories was admissible on the issues of Pearl's comparative negligence [27] and punitive damages. [28]

¶ 31 The express preemption provision contained in the FRSA calls for "nationally uniform" laws "related to railroad safety,"

---

**26.** In Appellee's Petition for Writ of Certiorari and in Appellee's Brief in Response to Appellant's Brief in Chief, Plaintiff/Appellee, Pearl's **sole** argument as to what allegedly constituted such a specific, individual hazard was the Railroad's alleged broken "promises" regarding increasing of train speed and alleged promise to "adjust warning times for motorists" through crossings in Mena, Arkansas. However, The COCA identified additional factors comprising the alleged "local hazard condition," or "local safety hazard," as referenced at trial by Plaintiff's expert witness as follows: (1) inadequate sight distance, requiring improved sight distance or mechanized warning devices; (2) improbability that Pearl would have heard the horn; (3) difficulties in the configuration of the crossing; (4) the "non-recovery" status of the crossing, meaning "[o]nce you pass a very small window of opportunity if you do not make a decision at that point and [sic] time, it's then too late if you get any information about crossing"; (5) Railroad's failure to instruct its crew or personnel regarding the extra hazards at the crossing; and (6) operation of the crossing with passive devices. The COCA correctly determined, pursuant to *Stevenson v. Union Pac. R.R. Co.,* 110 F.Supp.2d 1086 (E.D.Ark., 2000), that none of these factors constituted a "specific, individual hazard" such that would be saved from federal preemption. We note, however, that although not specifically addressed by the parties or the COCA, evidence of the audibility of the horn is improper in light of Pearl's abandonment of the audible horn claim and subsequent granting of Railroad's Motion for Partial Summary Judgment as to that claim. The other factors are clearly preempted by federal law, as they are clearly "capable of being adequately encompassed within uniform national standards and

are already accounted for in the Secretary's regulations governing maximum operational speeds." *Id.* at 1091.

**27.** In its Answer, the Railroad raised the affirmative defenses of "comparative fault, comparative negligence, contributory negligence, unavoidable accident and federal preemption as complete and/or partial bars to the recovery of the Plaintiff...." The trial court instructed the jury pursuant to the Oklahoma Uniform Jury Instructions that "[u]nder the law you are to compare the percentage (0% 100%) of negligence of Mr. Pearl, if any, with the percentage (0% 100%) of negligence of Kansas City Southern Railway Company, John Locke, and Jerry Hinds, if any." OUJI Civ. (2d) 9.17 and 9.19.

**28.** While we hold that evidence regarding excessive train speed, adequacy of warnings and conditions characterized in this case as "local hazard conditions"and/or "local safety hazard" is inadmissible on the issue punitive damages, we affirm the trial court's denial of Railroad's Motion for Directed Verdict on the issues of liability and punitive damages because evidence may be presented pertinent to the surviving vegetation claim such that may substantiate Pearl's position that the Railroad acted either negligently or with "reckless disregard to the rights of others" to support a punitive damages award. Where there is evidence that would "support an inference of gross negligence or reckless disregard/indifference for the safety of others ... the Trial Court was not free to refuse to submit and instruct on the issue of punitive damages." *Shuman v. Laverne Farmers Coop.,* 809 P.2d 76, 79 (Okla.App. 1991).

but permits states to "adopt or continue in force a law, regulation or order related to railroad safety *until* the Secretary of Transportation prescribes a regulation or issues an order *covering the subject matter* of the State requirement." 49 U.S.C. § 20106 (emphasis added). The U.S. Supreme Court has held that where the federal regulations at 23 C.F.R. §§ 646.214(b)(3) and (4) and 49 C.F.R. § 213.9 apply, they cover "the subject matter of the relevant state law" relating to railroad safety. *CSX Transp. Inc. v. Easterwood,* 507 U.S. 658, 665, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).[29]

¶ 32 Specifically with respect to preemption of state law on the subject of adequacy of warning devices, the U.S. Supreme Court has held that "[w]hen the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a *federal standard for the adequacy* of those devices that *displaces state tort law* addressing the same subject." *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 357, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (emphasis added). Further, *Easterwood* provided that §§ 646.214(b)(3) and (4) "*displace state and private decisionmaking authority* by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732. (emphasis added). "In short, for projects in which federal funds participate in the installation of warning devices, the *Secretary has determined the devices to be installed* and the means by which railroads are to participate in their selection." *Id.* at 671 (emphasis added).

¶ 33 Likewise, with respect to the evidence regarding excessive train speed, the provisions of 49 C.F.R. § 213.9 establish the maximum speeds trains are permitted to travel

given the classification of the track on which they operate. The U.S. Supreme Court has held the federal "speed limits must be read as not only establishing a ceiling, but also *precluding additional state [law]*" such as "the common-law duty to operate [a train at] a moderate and safe rate of speed." *Easterwood,* 507 U.S. at 674, 113 S.Ct. 1732 (emphasis added). Further, regarding the scope of federal preemption, *Easterwood* held that § 213.9(a) "cover[s] the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id.* at 675, 113 S.Ct. 1732.

¶ 34 Despite the U.S. Supreme Court's guidance as to the broad scope of federal preemption as expressly provided in *Shanklin* and *Easterwood* and contrary to the express preemption language of the FRSA, the COCA narrowly construed the scope of federal preemption to extend no further than negligence claims. The U.S. Supreme Court has not limited the scope of federal preemption under the FRSA to mere negligence *claims,* but rather, has determined that preemption extends to "state tort law" and to the "legal duties imposed on railroads by the common law." *Shanklin,* 529 U.S. at 352, 357, 120 S.Ct. 1467; *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732. This Court has held that federal preemption extends to preempt the state-tort-law "theories" based upon adequacy of warning devices, excessive train speed and kindred theories of liability. *Myers v. Missouri Pac. R.R. Co.,* 2002 OK 60, 52 P.3d 1014. Furthermore, in *Myers,* we affirmed the trial court's ruling "that federal law preempts *evidence* of the need for additional warning devices [and] that federal law preempts *evidence* that the train was traveling at an excessive speed." *Myers,* 2002 OK 60, ¶ 1, 52 P.3d at 1019, n. 2. Additionally, we held that "*any state-tort-law*

---

29. In *Easterwood,* the U.S. Supreme Court explained the preemptive effect of the federal statute's use of the terms "relating to" and "covering." *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732. The preemption provision of the FRSA provides that "[l]aws ... related to railroad safety shall be nationally uniform ...," while the statute also expressly preempts State law when "the Secretary prescribes a regulation ... covering the subject matter of the State requirement." 45 U.S.C. § 434 (now codified at 49 U.S.C.

§ 20106(2000)) *Easterwood* determined that "[l]egal duties imposed on railroads by the common law fall within the scope of these broad phrases." *Id. Easterwood* explained that the statute's use of the term "relating to" confers broad preemptive effect, while the term "covering" is more restrictive. Since the FRSA contains the more restrictive term, the U.S. Supreme Court concluded that "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

*claim*[30] against a railroad based on a theory of excessive speed is preempted so long as the train in question was operating within the federally approved speed limit." *Id.* at ¶ 19, 1023 (emphasis added).

¶ 35 Pursuant to these authorities, we hold that federal law preempts evidence regarding adequacy of warning devices, excessive train speed and/or the alleged "local hazard conditions," [31] which is offered for the purpose of proof of a state law tort claim for punitive damages and/or the issue of comparative negligence. Such evidence is part of the relevant state law substantially subsumed by federal regulations regarding railway safety and is thereby preempted.

¶ 36 If we were to permit Pearl to introduce evidence at trial regarding the adequacy of warning devices on the issue of the Railroad's comparative negligence defense and/or punitive damages claim, this would amount to an impermissible challenge of the federal standard of adequacy of warning devices.[32] If Pearl were likewise allowed to

**30.** *See also Cochran v. CSX Transp., Inc.* 112 F.Supp.2d 733, 738 (N.D.Ind.2000) (holding, pursuant to *Shanklin,* that once the crossbucks were installed with federal funds under a program approved by the FHWA, "federal law preempted *any state law claim* regarding the adequacy of the warning device at that particular crossing.")

**31.** Our holding does not disturb the specific, individual hazard exception to federal preemption, nor does it disturb the FRSA's provision allowing state law when necessary to reduce an "essentially local safety hazard." We reject Pearl's argument that the alleged "local hazard conditions," "local safety hazards" and/or "abnormally dangerous" conditions at the Pickering Street Crossing fall within the specific, individual hazard exception to federal preemption and likewise reject the related argument that these conditions are saved from preemption via the "savings clause" of the FRSA for an "essentially local safety hazard." Although Pearl argued these conditions were "local," "specific, individual," or otherwise unique in character, we reject this characterization, as each of the alleged conditions at the crossing in this case is capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national regulations. "Hazards posed by track conditions, including those existing at grade crossings, are capable of being taken into account by the Secretary and are covered by the federal speed regulations." *Myers v. Missouri Pac. R.R. Co.,* 2002 OK 60, ¶ 28, 52 P.3d at 1028. Preemption of evidence in this case extends to the conditions alleged by Pearl to be "local hazard conditions," including the alleged "broken promises" regarding the Railroad's increase in speed through Mena, Arkansas along with corresponding alteration of warning devices, as well as the factors identified by Pearl's expert witness at trial. *See supra,* note 26.

**32.** In certain instances, the Oklahoma Evidence Code permits admission of relevant evidence, which may not be admissible for all purposes, but may nonetheless be admissible if offered for another purpose. *See, e.g.,* 12 O.S.2001 § 2408 (evidence of compromise and offers to compromise are inadmissable except "when it is offered for another purpose, including proof of bias or prejudice of a witness, negativing a contention of undue delay, or proof of an effort to obstruct a criminal investigation or prosecution."); 12 O.S. 2001 § 2404 (evidence of a person's character is inadmissible to prove conformity therewith, but "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."); 12 O.S.2001 § 2407 (evidence of subsequent remedial measures is inadmissable "to prove negligence or culpable conduct," but admissible "when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."). Pearl argues evidence of excessive train speed and adequacy of the warning devices is admissible when such evidence is offered to prove Railroad's comparative negligence and/or punitive damages as opposed to the impermissible offering of such evidence to proof Railroad's negligence liability. This case is distinguishable from the above instances in which the Oklahoma Evidence Code permits evidence for "another [permissible] purpose," because in the instant case, Pearl offers the evidence for the *identical impermissible purpose* of proof that Railroad's warning devices were inadequate and that it operated its train at an excessive rate of speed.

The COCA based its decision to permit introduction of evidence regarding adequacy of warnings and excessive train speed for the purpose of Pearl's mitigation of the Railroad's comparative negligence defense on *Mickelson v. Montana Rail Link, Inc.* 299 Mont. 348, 999 P.2d 985 (2000). In *Mickelson,* the railroad defendant had voluntarily placed a yellow blinking light on its train, which was in addition to the headlight required by federal law. The plaintiff in *Mickelson* claimed that since the railroad had placed an additional warning light not mandated by federal law, it had the "obligation to do so effectively and with due care" in the placement of such a light in a proper location on the train. *Id.* at 367, 999 P.2d 985. The railroad defendant raised the defense that the train was "plainly

challenge the federal maximum speed limit by submission of evidence regarding the train's alleged excessive speed on the issues of comparative negligence and/or punitive damages, the jury would be permitted to improperly supplant its determination of train speed limits for that of the Secretary of Transportation. Allowing the jury to apportion the parties' relative fault and/or determine the propriety of punitive damages on the basis that the train was traveling at an excessive rate of speed would "completely

deprive the Secretary of the power to preempt state common law." *Easterwood,* 507 U.S. at 675, 113 S.Ct. 1732.

 ¶ 37 To allow Pearl to admit evidence that would permit the jury to apportion the Railroad's fault on the basis of such a challenge is akin to allowing Pearl to improperly submit a claim for negligence based upon adequacy of warnings, excessive train speed and alleged dangerous conditions of the crossing.[33] Where such negligence

visible to a motorist by 'virtue of its speed, by virtue of its headlights and its yellow strobe light.'" *Id.* at 366–67, 999 P.2d 985. The plaintiff sought to present contrary evidence that the voluntarily placed single, yellow blinking light on the train was masked by the headlight and that if the railroad defendant had wanted to make its train "plainly visible," it should have placed two yellow lights in a lower location on the front of the train. The Supreme Court of Montana held that because the defendant railroad was permitted to offer testimony that the train was plainly visible because of its lighting configuration, the plaintiff should be permitted to introduce evidence to rebut that evidence that the lighting configuration did not in fact render the train plainly visible to motorists. Upon determining that any "arguments relating to additional lighting or alternative lighting is [sic] preempted by federal law" and inadmissible "as evidence of [the railroad defendant's] negligence or culpability," the *Mickelson* court emphasized that this evidence was "not offered to impose liability upon [the railroad] for failing to change its lighting configuration, but rather, to demonstrate that, contrary to [the railroad's] experts, the lighting configuration did not render the train "plainly visible" such that plaintiff was comparatively negligent for failing to see it." *Id.* at 996, 999. Further, the *Mickelson* court noted that without this evidence to rebut the railroad defendant's comparative negligence defense, this would essentially result in a directed verdict in the railroad defendant's favor, as the plaintiff would be denied "the right to rebut the evidence offered by [the railroad] in support of its contention that [plaintiff] was comparatively negligent." The *Mickelson* case is distinguishable from the case at bar for several reasons. First, Pearl does not argue that the Railroad in this case has voluntarily placed additional warning features other than those required by federal law such that Pearl disputes the placement of such features, nor does Pearl argue that additional warning devices have somehow obscured the crossbucks. Secondly, the Plaintiff in this case is not denied the right to rebut evidence, which may be offered by the Railroad in this case in support of its contention that Pearl was comparatively negligent, as Plaintiff remains entitled to present evidence pertinent to his vegetation claim.

**33.** Where the affirmative defense of comparative negligence is raised, the jury is instructed to apportion the fault of each party in regard to each party's varying degrees of negligence and "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is sought." Black's Law Dictionary 255 (5th ed.1979); *See supra* note 11. The trial court instructed the jury on the definition of comparative negligence pursuant to OUJI–Civ. (2d), Instructions No. 9.17 and 9.19, which provided in pertinent part as follows:

"As a part of their defense, the Defendants first denies [sic] that any negligence on their part was the direct cause of the occurrence involved in this lawsuit and any resulting injuries to William Franklin Pearl. Defendants further contend that if, however, the jury should find that they were negligent to some degree, then it is their contention that Mr. Pearl's own negligence exceeded the Defendant's negligence, so as to prevent any recovery by the plaintiff in this lawsuit.

Under the law you are to compare the percentage (0%–100%) of negligence of Mr. Pearl, if any, with the percentage (0–100%) of negligence of Kansas City Southern Railway Company, John Locke, and Jerry Hinds, if any.

The law provides that contributory negligence, which means the negligence of Mr. Pearl, shall not bar recovery of damages unless his negligence is of a greater degree, established by percentage, than the total combined negligence of Kansas city Southern Railway Company, John Locke, and Jerry Hinds, causing damage...." OUJI–Civ (2d), 9.17; 9.19.

Due to the very nature of the comparative negligence defense, it is inherently incapable of consideration separate and apart from the negligence claim to which it relates. Thus, where the affirmative defense of comparative negligence is raised, a negligence claim and the affirmative defenses of comparative and/or contributory negligence are inextricably intertwined. *See Davis v. Burlington Northern, Inc.,* 663 F.2d 1028, 1030 (10th Cir., 1981) (holding the Oklahoma comparative negligence statute "applies only in those cases where both the defendant and the plaintiff are negligent"). Since the negligence claims based upon adequacy of warnings and excessive train speed are preempted, the evidence on these

claims are preempted, evidence pertinent to such claims is likewise inadmissible when offered for purposes of proof of culpability.[34] *See Mickelson v. Montana Rail Link, Inc.,* 299 Mont. 348, 999 P.2d 985 (2000); *See also Pitasi v. Stratton Corp.,* 968 F.2d 1558, 1561 (2d Cir.1992) (holding that evidence regarding subsequent remedial measures inadmissible "to prove negligence or culpable conduct," but admissible to rebut contributory negligence defense where it would otherwise be "impossible for [plaintiff] to rebut defendant's argument that [plaintiff] was contributorily negligent."). This case is distinguishable from *Pitasi*, as the possibility remains for Pearl to rebut the Railroad's affirmative defense of comparative negligence despite the exclusion of evidence pertinent to warnings, train speed and alleged "local hazard" conditions. Pearl may still offer evidence pertinent to the vegetation claim in rebuttal to the Railroad's comparative negligence defense.

¶ 38 Finally, to allow Pearl to admit evidence regarding the adequacy of the warning devices and excessive train speed on the issue of punitive damages would permit the jury to punish a Railroad for complying with the applicable federal standards for warning devices at crossings and train speed. This not only offends logic, it is contrary to the law of federal preemption.

## V

### SUMMARY

¶ 39 While we recognize the COCA correctly determined that Pearl's state law negligence theories based upon adequacy of the warning devices, excessive train speed and "local hazard conditions" are preempted by federal law and that the trial court erred in instructing the jury on these issues, we vacate the COCA's opinion on other grounds. In accordance with federal law, U.S. Supreme Court case law and pursuant to precedent of this Court, we hold that the scope of federal preemption under the Federal Railroad Safety Act and regulations promulgated pursuant thereto, extends to bar evidence of adequacy of warning devices, excessive train speed and allegedly hazardous conditions existing at grade crossings when such evidence is offered for purposes of comparative negligence and punitive damages. Further, we uphold the trial court's instruction to the jury to analyze the negligence of the parties on the basis of Oklahoma law of negligence and comparative negligence in light of Oklahoma law's most significant relationship to the occurrence and the parties and remand for new trial to be held solely on Pearl's vegetation claim. Finally, we uphold the trial court's denial of the Railroad's motion for a directed verdict on the issues of liability and punitive damages.

¶ 40 Upon certiorari previously granted,

THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE DISTRICT COURT'S JUDGMENT IS REVERSED; AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH TODAY'S PRONOUNCEMENT.

¶ 41 OPALA, V.C.J., HODGES, HARGRAVE, KAUGER, SUMMERS, BOUDREAU and WINCHESTER, JJ., concur.

¶ 42 WATT, C.J., concurs in part; dissents in part.

matters must also be likewise excluded pursuant to federal preemption, as a jury may not be permitted to apportion the Railroad's percentage of fault on the basis of evidence regarding these issues.

34. The same underlying acts or omissions complained of in the preempted negligence action cannot be offered to prove that such identical acts or omissions amount to a more egregious level of misconduct. i.e., reckless disregard, warranting an award for punitive damages. *See Phillips v. Le Blond,* 494 F.Supp. 318, 325 (N.D.Okla.1980) (holding that where "there are no recoverable actual damages, there can be no recovery of punitive damages.")